UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ OCT 1 7 2013 ★

BROOKLYN OFFICE

----------------------------------------------------------------x

DEBBIE MITCHELL,

                            Plaintiff,

    -against-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

                            Defendant.

----------------------------------------------------------------x

MEMORANDUM & ORDER

09-CV-5429 (ENV)

VITALIANO, D.J.

      Pursuant to 42 U.S.C. § 405(g), plaintiff Debbie Mitchell seeks review of the final order of the Commissioner of the Social Security Administration (the "Commissioner") denying her application for disability benefits under the Social Security Act ("the Act"). She seeks reversal of the Commissioner's order and a finding that she is disabled within the meaning of the Act, or, in the alternative, a remand for further proceedings. The parties have filed cross-motions under Federal Rule of Civil Procedure 12(c) for judgment on the pleadings. For the reasons discussed below, the Commissioner's motion is denied, and Mitchell's motion is granted insofar as this case is remanded to the Social Security Administration ("SSA") for further proceedings and a rehearing before a different administrative

---

[1] As of February 14, 2013, Carolyn W. Colvin replaced Michael Astrue as the Acting Commissioner of Social Security. As a result, Carolyn W. Colvin is substituted as a party to this action. *See* Fed. R. Civ. P. 25(d). The caption is ordered amended to reflect the substitution.

law judge ("ALJ").

Background

I.    Procedural History

On July 26, 2006, Mitchell applied for Supplemental Security Income ("SSI") disability benefits due to various psychological impairments, including depression and an anxiety disorder. (Tr. at 99).[2] Mitchell alleged an onset date of January 1, 2005. (Tr. at 99). SSA denied her application on February 12, 2007; she requested a hearing before an ALJ. (Tr. at 14). On November 24, 2008 that hearing was held in Queens before ALJ Seymour Fier. Mitchell appeared and testified, along with medical expert Dr. Edward Halpern. (Tr. at 14).

In a January 26, 2009 written decision, the ALJ denied Mitchell's claim for benefits. The ALJ concluded that, while several of her conditions constituted minor or moderate impairments, Mitchell retained the residual functional capacity ("RFC") to perform simple tasks in a low stress environment and was capable of performing her past relevant work. (Tr. at 14-20). Consequently, the ALJ determined that she was not disabled within the meaning of the Act and denied her claim for benefits. (Tr. at 20). That decision became the final order of the Commissioner on October 9, 2009, when the Appeals Council denied Mitchell's request for review. (Tr. at 5-7). Mitchell timely filed this action on December 11, 2009.

---

[2]    Citations to the underlying administrative record are designated as "Tr.".

## II. Factual Background

### a. Personal and Work History

At the time of the Commissioner's order, Mitchell was 31 years old and had completed a sixth grade education. (Tr. at 23; *see also* Compl. (Dkt. No. 1) at 3). She then lived with her three children, then aged 10, 8, and 2. (Tr. at 17). Apart from weekly therapy sessions, Mitchell's days consisted mostly of light housework, taking care of her children, and watching television. (Tr. at 30-32, 109-114). She does not take public transportation and her social interactions are minimal. (Tr. at 30-32, 109, 113).

According to forms Mitchell submitted to SSA, she previously worked as a home caretaker between 1998 and 2004. (Tr. at 118). Her eight-hour workdays consisted of cooking, cleaning, doing laundry, and taking care of children, and she sometimes performed these tasks concurrently. (Tr. at 118). On May 22, 2004, Mitchell suffered a panic attack after an argument with her boyfriend and was taken to Jamaica Hospital Medical Center by ambulance. (117, 239-40). Soon thereafter, she was fired from her job because her employer felt she was no longer capable of caring for children. (Tr. at 168). She has not worked in any capacity since that time. (Tr. at 24, 114, 168).

### b. Evidence from Medical Sources

"[O]ut of desperation," Mitchell visited the New York Psychotherapy and

Counseling Center ("NYPCC") on January 24, 2006 seeking treatment for her inability to function in social situations. (Tr. at 152-53). Her reported symptoms included anxiety, depressed mood, lack of sleep, and paranoid delusions. (Tr. at 189). On February 20, 2006, Mitchell started monthly appointments with Dr. Samuel Lustgarten, M.D., a psychiatrist affiliated with NYPCC. (Tr. at 221). In his initial examination, Dr. Lustgarten administered a GAF test,[3] on which Mitchell scored a 65; she was later re-evaluated at a score of 50. (Tr. at 276, 278). Over the course of treatment Dr. Lustgarten diagnosed Mitchell with Anxiety Disorder NOS[4] with psychotic features and found her to be "suffer[ing] from paranoid delusions, depress[ion], mood[iness], anxiety, [and] panic attack[s]." (Tr. at 221; *see also* Tr. at 152, 222-27, 276). Dr. Lustgarten prescribed a host of medications to ameliorate Mitchell's symptoms, including Prozac, Buspar, Klonapin, Lithium, Risperidone, Lamictal, Fluoxetine, Propranolol and Ambien. (Tr. at 27, 253, 279-284). On August 31, 2006, he determined that Mitchell could not work for at least 12 months from that time, (Tr. at 251-52), and indicated in a May 2007 report that Mitchell

_____

[3]   GAF stands for Global Assessment of Functioning Scale. A score of 41-50 indicates serious symptoms or impairment in social, occupation, or school functioning. (Pl.'s Mem. (Dkt. No. 12, Att. 3) at 5 n.3). A score of 51-60 indicates moderate symptoms, and a score of 61-70 indicates mild symptoms, but allows the patient to function relatively well and have meaningful social relationships. (*Id.*)

[4]   NOS is an abbreviation for "not otherwise specified." (Pl.'s Mem. at 3 n.1). The phrase refers to disorders that do not meet the criteria for any specific type of anxiety disorder (*Id.*)

showed "marked" limitations"[5] in all work-related mental characteristics.

At the Comissioner's request, Dr. Arlene Rupp-Goolnick, Ph.D., a consulting psychologist, examined Mitchell on October 18, 2006. Dr. Rupp-Goolnick completed a full evaluation of plaintiff, diagnosed her with depressive and bipolar disorders, and stated that her condition would affect her "ability to function on a daily basis." (Tr. at 171). Dr. Nissan Schliselberg, M.D., a non-examining psychiatrist working for SSA, evaluated Mitchell's medical records on February 12, 2007. He determined that plaintiff suffered from anxiety related to disorders, but found insufficient clinical evidence to support the diagnoses of depression and bipolar disorder. (Tr. at 216-218). He also detected moderate limitations in Mitchell's work-related skills, but sight unseen concluded that her "attention, concentration and memory were intact," and that she could "remember, understand and carry out simple tasks." (Tr. at 218).

*c. Evidence from Non-Medical Sources*

On March 4, 2006, plaintiff began weekly therapy sessions with Jorge Niveyro, a licensed mental health counselor at NYPCC, which she apparently continued at least through November 2008. (Tr. at 180-87, 293-311). Niveryo's findings essentially mirrored those of Dr. Lustgarten: he determined that Mitchell was suffering from anxiety and depression, and assessed her judgment, insight, sensorium, and intellectual functioning as generally poor. (Tr. at 184-85, 293-94).

---

[5] "Marked limitations" are "serious limitation[s]" indicating "a substantial loss in the ability to effectively function." (Tr. at 226).

5

Like Dr. Lustgarten, Niveyro concluded that Mitchell was unable to work on account of her limitations. (Tr. at 185). However, both Niveyro and Dr. Lustgarten agreed that, over the course of her treatment at NYPCC, Mitchell displayed some improvement from the combined effects of weekly therapy sessions and medication. (*See* Tr. at 252, 288, 304, 306, 308)

It appears from the record that plaintiff began visiting other therapists at NYPCC at the beginning of 2008. For instance, the record includes a report and evaluation by Arthur Counts, a licensed clinical social worker dated January 4, 2008. (Tr. at 312). Other NYPCC therapists and/or supervisors who signed Mitchell's treatment review plans over the course of 2008 (and who therefore likely played a role in her treatment) include licensed clinical social workers Werner Perlman, John Montalto, Paul Ney, and Angel Maldonado. (Tr. at 220, 312-323). However, none of these individuals are mentioned in the ALJ's decision.[6]

### d. The Hearing

Presented at the November 2008 hearing before ALJ Fier was testimony from Mitchell herself and Dr. Edward Halpern, a non-examining medical expert who had reviewed Mitchell's medical records at the ALJ's request. Mitchell's testimony reaffirmed the information she had provided in forms filed with SSA and provided further details about her earlier life, the welfare assistance she was then receiving,

---

[6] At the hearing, plaintiff also stated that she had previously received treatment from a physician she recalled was named Dr. Wesner and a therapist named Peter. (Tr. at 27-28). She provided no other identifying information with regard to either individual.

and the extent of her impairments. (Tr. at 23-38). Dr. Halpern's testimony was largely a summary and, essentially, provided a review of reports made by other professionals. (Tr. at 38-42). He testified that, while Mitchell appeared to be suffering from an anxiety disorder and depression, he saw no evidence of bipolar disorder. (Tr. at 38-39). He also asserted that plaintiff's anxiety disorder was not severe enough to meet the listed criteria in the regulations at Step 3, and that her limitations were only "moderate." (Tr. at 38, 42).[7]

### e. ALJ's Decision

The ALJ's January 26, 2009 written decision denied plaintiff's claim for benefits. (Tr. 14-20). Although he found that Mitchell suffered from severe anxiety, the ALJ nonetheless determined that her impairment did not qualify as a listed condition, and, affirmatively, that she could work at all exertional levels if assigned simple tasks in a low-stress environment. (Tr. at 16-19). In line with these findings, the ALJ concluded that Mitchell could perform her past relevant work and was not disabled within the meaning of the Act. (Tr. at 19-20). The decision explained that, of the two physicians that examined Mitchell— Drs. Lustgarten and Rupp-Goolnick—he granted "greater weight" to the latter's opinion. (Tr. at 19). He asserted that Dr. Lustgarten's assessment that "claimant was markedly limited in every area of functioning . . . cannot be given special consideration because . . . [it is]

---

[7] A number of physicians also discussed Mitchell's physiological health. Apart from hypertension and a single instance of leg pain (possibly the result of conversion disorder), no report of physiological abnormalities appears in the record. (See Tr. at 172-75, 218, 220, 285-86, 289).

not consistent with the sparse positive findings on examination." (Tr. at 19). By contrast, he found that Dr. Rupp-Goolnick's findings were "consistent with the residual functional ability found by the undersigned and based on actual positive findings and examination." (Tr. at 19). Except for a single, catch-all paragraph that named no individual expert, the ALJ did not address any of the reports by, or opinions of, the counselors or social workers from NYPCC.

Plaintiff now argues that the ALJ committed legal error by discounting the opinion of her treating physician, Dr. Lustgarten. (Pl.'s Mem. at 1, 9, 16). The Commissioner maintains that the ALJ's decision rests on sound legal footing.

## Discussion

### I.     Standard of Review

Section 405(g) of the Act empowers district courts to review a disability decision of the Commissioner and affirm, reverse, or modify that decision "with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g); *see Butts v. Barnhart*, 388 F.3d 377, 385 (2d Cir. 2004). Yet, this power of review is not unbounded. When evaluating a determination by the Commissioner to deny a claimant disability benefits, a court may reverse the decision only if it is based upon legal error or if the factual findings are not supported by substantial evidence. *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g)). "Substantial evidence is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

Courts are advised to "keep[] in mind that it is up to the agency, and not [the] court, to weigh the conflicting evidence in the record." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998). When evaluating the evidence, "the court may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a *de novo* review." *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991).

II.     Standards for Entitlement to Benefits

To be eligible for disability benefits, a claimant must establish disability within the meaning of the Act having an onset prior to the expiration of the claimant's insured status. 42 U.S.C. §§ 423(a)(1)(A), 423(c). SSA has promulgated a five-step sequential analysis that an ALJ must use to determine whether a claimant qualifies as disabled. *See, e.g., Rosa v. Callahan*, 168 F.3d 72, 77-78 (2d Cir. 1999). First, the ALJ must determine whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). Second, if the claimant is not engaged in substantial gainful activity, the ALJ must determine whether the claimant has a "severe" impairment that limits her work-related activities. *Id.* § 404.1520(a)(4)(ii). Third, if such an impairment exists, the ALJ evaluates whether the impairment meets or equals the criteria of an impairment identified in the Commissioner's appendix of listed impairments. *Id.* § 404.1520(a)(4)(iii). If so, the claimant is entitled to benefits. If not, the ALJ proceeds to the fourth step and determines whether the claimant has the residual functional capacity to perform her

past relevant work.[8] *Id.* § 404.1520(a)(4)(iv). This step requires that the ALJ first make an assessment of the claimant's residual functional capacity generally. *Id.* § 404.1520(e); *see also id.* § 404.1545. Fifth, if the claimant cannot perform her past work, the ALJ determines whether there is other work that the claimant could perform. *Id.* § 404.1520(a)(4)(v). At this step, the ALJ must consider four factors: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (internal quotations omitted).

The claimant bears the burden of proof as to the first four steps of the process for determining disability status. *See, e.g., Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). If the claimant proves that her impairment prevents her from performing past relevant work, the burden shifts to the Commissioner at the final step. *Id.* In the fifth step, the Commissioner must show that the claimant retains the residual functional capacity to perform a certain category of work, such as light work or sedentary work, and that such work is available in the national economy. *Curry v. Apfel*, 209 F.3d 117, 122-23 (2d Cir. 2000). Subsequent SSA regulations have removed the requirement that the Commissioner bear the burden of showing residual functional capacity, at least in cases in which the onset of disability

---

[8]  Under the regulations, "past relevant work" is defined as "work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it." 20 C.F.R. § 404.1560(b)(1).

postdates August 26, 2003. 20 C.F.R. § 404.1560(c)(2); *see Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).[9]

III.   The Treating Physician Rule

Under SSA regulations, "[t]he opinion of a treating physician is given controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence." *Rosa v. Callahan*, 168 F.3d 72, 78-9 (2d Cir. 1999) (*citing* 20 C.F.R. § 404.1527(c)(2)). This is known as "the treating physician rule." Although "[a] treating physician's statement that the claimant is disabled cannot itself be determinative," since that question is ultimately reserved for the Commissioner, the treating physician's opinion as to "*the nature and severity of [a claimant's] impairment(s)*" *is* determinative if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) (*citing* 20 C.F.R. § 404.1527(c)(2)) (emphasis in original). The Second Circuit has previously held that a treating physician's RFC assessment for a claimant relates to the nature and severity of an impairment, and, hence, is subject to controlling weight evaluation under the treating physician rule. *See, e.g.*,

---

[9]   The Second Circuit has "left open" the question of whether the Commissioner bears the burden of proving residual functional capacity if the claimant's onset of disability is earlier than August 26, 2003. *Mancuso v. Astrue*, 361 Fed. App'x 176 (2d Cir. 2010). However, district courts in the Second Circuit have consistently applied the old *Curry* standard when the claimant's onset of disability precedes that date. *See Cataneo v. Astrue*, No. 11-CV-2671, 2013 WL 1122626, at *22 (E.D.N.Y. Mar. 17, 2013) (collecting cases). Though interesting, that questions is academic here since the onset of disability occurred in 2005.

11

*Sanders v. Comm'r of Soc. Sec.*, No. 11-2630-CV, 2012 WL 6684569, at **2-3 (2d Cir. Dec. 26, 2012) (remanding the case because ALJ had not justified his failure to accord controlling weight to the treating physician's RFC assessment).

As Mitchell's treating physician, Dr. Lustgarten found that Mitchell's mental health limitations were "marked" in every area of functioning, and that she was unable to work for at least 12 months as a result. (Tr. at 226, 251-52). However, ALJ Fier discounted that opinion in favor of Dr. Rupp-Goolnick's views on the grounds that the former was "not consistent with the sparse positive findings on examination." (Tr. at 19). By contrast, the ALJ deemed Dr. Rupp-Goolnick's report "consistent with the residual functional ability found by the undersigned and based on actual positive findings." (Tr. at 19). In short, the ALJ chose the views most consistent with his own findings.

The ALJ's assignment of lesser weight to Dr. Lustgarten's assessment of Mitchell cannot pass muster under the treating physician rule. First, courts have repeatedly cautioned ALJs not to place substantial reliance on one-time consultative evaluations such as Dr. Rupp-Goolnick's evaluation and report. *See, e.g., Simmons v. U.S. R.R. Retirement Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) ("The opinion of a consulting physician who examined the claimant once generally does not constitute substantial evidence on the record as a whole, particularly when contradicted by other evidence."); *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990) ("[I]n evaluating a claimant's disability, a consulting physician's opinions or report should be given limited weight."). Eerily instructive on this point is *Spielberg v. Barnhart*, 367 F.

Supp. 2d 276, 283 (E.D.N.Y. 2005), where the court observed that "although there was disagreement over whether plaintiff's limitations were moderate or marked, the one-time assessments should not have been considered 'substantial evidence.'" *See also Moore v. Astrue*, No. 07-CV-5207 (NGG), 2009 WL 2581718, at *10 n. 22 (E.D.N.Y. Aug. 21, 2009) ("[A]n inconsistency with a consultative examiner is not sufficient, on its own, to reject the opinion of the treating physician.").

Pointedly, Dr. Rupp-Goolnick examined Mitchell on one occasion only, while Dr. Lustgarten met with her on a monthly basis for over two years. Both doctors found impairments. In discounting the treating physician's assessment the ALJ merely posited that Dr. Lustgarten's findings were "not consistent with the sparse positive findings on examination," whereas Dr. Rupp-Goolnick's were "consistent with the residual functional ability" the ALJ himself had found that was, seemingly in *ipse dixit* fashion, "based on actual positive findings." (Tr. at 19). In the absence of further explanation and analysis, this justification is virtually meaningless. Specifically, ALJ Fier does not explain what these "sparse positive findings" actually are and who made them, or whether Dr. Lustgarten's monthly observations of Mitchell over the course of two years were included or excluded from his consideration. Although the memory and counting tests were administered by Dr. Roop-Goolnick, there is no way to tell whether the ALJ anchored his findings in these results, and if so, why. These simple tests, moreover, neither contradict nor displace Dr. Lustgarten's findings. In fact, Mitchell did not perform particularly well on them: she could only remember two out of three objects after five minutes,

13

and was able to count in serial threes up to six digits forwards and four digits backwards. (Tr. at 170.) Neither Dr. Roop-Goolnick nor ALJ Fier offered any indication of how Mitchell's performance compared to the average test-taker, thus limiting the usefulness of the test. Clearly, this does not constitute substantial evidence undercutting Dr. Lustgarten's opinion. Bluntly, both experts found significant impairments, disagreed about their severity, and the ALJ improperly chose to credit the one-time examinor's conclusions over that of the long-time treating physician.

On a related front, ALJ Fier also makes much of the fact that plaintiff was capable of performing some household chores and activities, such as feeding herself and her children, paying her bills, walking, and communicating with neighbors in order to receive help from them. (Tr. at 18-19). Yet, these facts prove little. As courts have held, evidence of a claimant's ability to complete household chores does not defeat a claim for disability, "as people should not be penalized for enduring the pain of their disability in order to care for themselves." *Woodford v. Apfel*, 93 F. Supp. 2d 521, 529 (S.D.N.Y. 2000); *see also Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("We have stated on numerous occasions that a claimant need not be an invalid to be found disabled under the Social Security Act.") (internal quotations omitted). Plaintiff's ability to perform basic tasks in the confines of her home and neighborhood in order to live and care for her children does not undermine Dr. Lustgarten's medical opinion.

Furthermore, in the first place, the ALJ inaccurately declares that Dr. Roop-

Goolnick's findings are "consistent with the residual functional ability found by the undersigned." (Tr. at 19). As previewed above, this assertion, since it suggests this congruency was the basis for the ALJ's favorable consideration, is problematic enough on its face. ALJs are instructed to base their RFCs determinations on all the evidence before them—including all medical opinions—rather than self-formulate them and *then* compare them to the various medical opinions in the record, as ALJ Fier seems to have done, and give controlling weight to the medical opinion that best fits. *See* 20 C.F.R. § 404.1545(a)(3)-(4). That would be bad enough. However, here, the ALJ is also simply incorrect in seeing congruency: Dr. Roop-Goolnick's findings do not reflect the determination espoused by the ALJ that Mitchell "has no restriction" in "activities of daily living" and only mild or moderate limitations otherwise, enabling her to "perform the entire range of work at all exertional levels . . . [if given] simple tasks . . . in a low-stress environment." (Tr. at 17, 19).

In fact, Dr. Rupp-Goolnick found that, while plaintiff could complete simple tasks, maintain concentration, and relate adequately to others, she could "*not* maintain a regular schedule due to depression," could *not* "perform complex tasks independently . . . [or] make appropriate decisions," and was "*overwhelmed and overburdened*" as a mother. (Tr. at 170) (emphasis added). She concluded in the *coup de grace*, that Mitchell's "psychiatric problems . . . may significantly interfere with [her] ability to function on a daily basis." (Tr. 171). In rummaging through Dr. Rupp-Goolnick's opinion ALJ Fier selectively chose to leave these findings out in favor of ones more in harmony with his own RFC determination. *See Gecevic v.*

15

*Secretary of Health and Human Services*, 882 F.Supp. 278, 286 (E.D.N.Y. 1995) (an ALJ "cannot simply selectively choose evidence in the record that supports his conclusions").

Quite simply, the ALJ, in failing to identify substantial evidence casting doubt on Dr. Lustgarten's findings, also failed to identify substantial evidence supporting his mischaracterized version of the favored opinion of Dr. Rupp-Goolnick. But even if he *had* articulated a valid record basis for granting less than controlling weight to Dr. Lustgarten's opinion, the ALJ still would have committed legal error because he did not discuss or analyze "[the requisite] 'factors' to determine *how much* weight to give to the opinion." *Halloran*, 362 F.3d at 32 (*citing* 20 C.F.R. § 404.1527(d)(2)) (emphasis added); [10] *see also Schaal*, 134 F.3d at 504-05 (2d Cir. 1998) (ALJ's failure to provide "good reasons" for discounting a treating physician's medical opinion constitutes legal error); *Pierre v. Astrue,* No. 09-CV-1864 (JG), 2010 WL 92921, at *10 (E.D.N.Y. Jan. 6, 2010) ("[A]n ALJ is required by the regulations to explain the degree a treating source's opinion deserve when it is found not to be controlling, and consider specified factors in that determination."). These factors are:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the [SSA's] attention that tend to support or contradict the opinion.

---

[10]   This regulation has since been renumbered 20 C.F.R. § 404.1527(c)(2).

*Halloran*, 362 F.3d at 32 (*citing* 20 C.F.R. § 404.1527(d)(2)).[11] The regulations also specify that the ALJ "will always give good reasons in [his] notice of determination or decision for the weight [he] give[s] [claimant's] treating source's opinion." 20 C.F.R. § 404.1527(c)(2); *accord id.* § 416.927(c)(2).

In reaching his decision, the ALJ undertook no such analysis with regard to the findings and opinions of Dr. Lustgarten, nor did he specify how much weight he granted to that opinion (the decision suggests it was very little). Rather, he simply asserted that Dr. Lustgarten's opinion "cannot be given special consideration," and that Dr. Rupp-Goolnick's deserved "greater weight." (Tr. at 19). There was no assessment, for example, as to why one or another test result or observation was more or less credible than another. The ALJ's declared conclusion, standing alone, does not satisfy the standards described in the regulations, and constitutes legal error.

IV.    The ALJ Failed to Adequately Evaluate Other Source Evidence

On yet another front, the ALJ failed to properly evaluate the opinions of the non-medical experts that treated Mitchell at NYPCC. These include licensed mental health counselor Jorge Niveyro, Mitchell's therapist who saw her on a weekly basis for over two years, and licensed clinical social workers Paul Ney, Werner Perlman, Arthur Counts, John Montalto, and Angel Maldonado. (*See* Tr. at 220, 312-323). Although they are not "acceptable medical sources," therapists and social workers

---

[11] *See* n. 14, *supra*.

are "other sources" whose opinions must be considered by an ALJ. *See* 20 C.F.R. § 416.913(d) (defining "other sources"); *White v. Comm'r of Soc. Sec.*, 302 F.Supp.2d 170, 176 (W.D.N.Y. 2004) (holding that "the ALJ erred by not giving appropriate weight to the opinion of plaintiff's social worker"); *Schaal v. Callahan*, 993 F. Supp. 85, 94 (D. Conn. 1997) (holding similarly); SSR 85–16, 1985 WL 56855, at *4 (S.S.A. 1985) (other sources, including social workers and mental health centers, "may play a vital role in the determination of the effects of impairment"). "In fact, '[a]n opinion from a "non-medical source" who has seen the claimant in his or her professional capacity may, under certain circumstances, properly be determined to outweigh the opinion from a medical source, including a treating source.'" *Kitt v. Astrue*, No. 10–CV–839S, 2012 WL 1038627, at *5 n.7 (W.D.N.Y. March 27, 2012) ((quoting SSR 06-03p, 2006 WL 2329939 at *4 (Aug. 9, 2006)).

Here, the ALJ all but ignored the evaluations of Niveyro, Perlman, Counts, Montalto, and Maldonado in his opinion. Collectively, these individuals' names appear on approximately 40 pages worth of reports that were part of the record. (*See* Tr. at 220, 180-87, 293-323). ALJ Fier devoted only one paragraph to "medical records from New York Psychotherapy and Counseling Center," cited to only three of the 40 pages,[12] and made no reference to any of the individual non-medical sources or their actual judgments about Mitchell's impairments and functioning.

---

[12] The ALJ cites to "Exhibit 20-F, pages 7, 10, 27, 46 and 47." (Tr. at 17). The latter three pages correspond to Tr. at 293 (the first page a report by Niveyro) and 312-13 (a report signed by Counts and Maldonado). He cites to no reports signed by Ney, Perlman, or Montalto.

(Tr. at 17). The ALJ gave short shrift to potentially crucial evidence by glossing over these reports. That was legal error, *see, e.g.*, *White v. Comm'r of Soc. Sec.*, 302 F.Supp.2d 170, 176 (W.D.N.Y. 2004) (holding that "the ALJ erred by not giving appropriate weight to the opinion of plaintiff's social worker"); *Schaal v. Callahan*, 993 F. Supp. 85, 94 (D. Conn. 1997) (holding similarly); that error was magnified by the affiliation of these disregarded non-treating sources with NYPCC, where Dr. Lustgarten was based.

Moreover, to the extent the ALJ *did* address reports by NYPCC personnel, his evaluation was deficient. The single paragraph in which he considered these reports consists primarily of cherry-picked observations that supported his ultimate finding of no disability, such as the fact that "claimant's grooming was appropriate," that "her memory was considered to be fair," and that she was "cooperative." (Tr. at 17). At the same time, escaping the ALJ's gaize was the wealth of contrary findings included in these reports, such as Ney's conclusion that Mitchell was "minimally able to function in her normal life affairs let alone in a work setting," the significant amount of help she needed from her neighbors in completing basic tasks, and reports of Mitchell's persistent anxiety, distress that something bad would happen to her, and fears of simply walking in her neighborhood. (*See, e.g.*, Tr. at 220, 312 318-319). Again, an ALJ "cannot simply selectively choose evidence in the record that supports his conclusions." *Gecevic*, 882 F.Supp. at 286. The ALJ in this case acted in exactly such a manner—it was improper, it is legal error and it makes a remand for further proceedings

19

inescapable.

V.    Proceedings on Remand

Plaintiff requests that her case be remanded solely for calculation of the monthly benefits payable to her. (Compl. at 16). Such a remedy is only appropriate "when the record provides persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose." *Pratts v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980). However, "[w]here there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the Second Circuit has], on numerous occasions, remanded to the Commissioner for further development of the evidence." *Rosa*, 168 F.3d at 82-83. In this case, the ALJ failed to adhere to the treating physician rule with regard to Dr. Lustgarten's opinion and did not give proper consideration to the non-medical source evidence adduced at the hearing. Because it is the role of an administrative law judge and the Commissioner, and not the Court, to consider such evidence in accord with the legal standards governing the evaluation of such evidence, further evidentiary proceedings are warranted, and remand solely for calculation of benefits is inappropriate. But, it is compelling from the Court's review of the existing record and what the administrative decision revealed of the analytical process on the first go-round that ALJ Fier, the "undersigned," reached his own conclusions about plaintiff's disability and then searched the evidentiary record for support. Remand for further proceedings before a different administrative law judge other than ALJ Fier is, thus, also warranted.

<u>Conclusion</u>

20

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is denied. Mitchell's cross-motion is granted to the extent that the final order of the Commissioner is vacated, the administrative decision is reversed and the matter remanded for further proceedings consistent with this Memorandum and Order and a rehearing before a different ALJ.

So ordered.

Dated: Brooklyn, New York
      October 4, 2013

/S/ Judge Eric N. Vitaliano

ERIC N. VITALIANO
United States District Judge